**Electronically Filed
Intermediate Court of Appeals
CAAP-17-0000871
15-FEB-2019
07:45 AM**

NO. CAAP-17-0000871

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


STATE OF HAWAI'I, Plaintiff-Appellee
v.
JAMES SIUGPIYEMAL, Defendant-Appellant

APPEAL FROM THE CIRCUIT COURT OF THE SECOND CIRCUIT
(CR. NO. 2PC14-1-0774)

MEMORANDUM OPINION
(By: Fujise, Presiding Judge, Chan and Hiraoka, JJ.)

Defendant-Appellant James Siugpiyemal **(Siugpiyemal)**
appeals from the Judgment Conviction and Sentence **(Judgment)**
entered by the Circuit Court of the Second Circuit **(Circuit
Court)**[1] on November 14, 2017.  Siugpiyemal contends that the
Circuit Court erred by:

      1.    denying his motion for judgment of acquittal;

      2.    refusing to admit into evidence a defense asserted
by the State in a civil action filed by the complaining witness
**(CW)**;

      3.    improperly instructing the jury; and

      4.    denying his motion for a new trial.

Upon careful review of the record and the briefs
submitted by the parties and having given due consideration to
the arguments advanced and the issues raised, as well as the
relevant statutory and case law, we affirm the Judgment for the
reasons set forth below.

---

[1]     The Honorable Joseph E. Cardoza presided.

I.

Siugpiyemal was employed by the State of Hawaiʻi Department of Public Safety (**DPS**) as an Adult Corrections Officer in the Maui Community Correctional Center (**MCCC**) from before June, 2014, until October 9, 2014. During that time, CW was an MCCC inmate committed to the Director of DPS in the work furlough program.

On October 24, 2014, a grand jury returned a five-count indictment charging Siugpiyemal with Sexual Assault in the Second Degree and Sexual Assault in the Third Degree. The grand jury charged that Siugpiyemal sexually assaulted CW on July 31, 2014 (**Count One**) and on August 11, 2014 (**Counts Two, Three, Four and Five**). The indictment was filed in the Circuit Court on October 27, 2014. Siugpiyemal left Maui on October 9, 2014, and was returned on November 5, 2016, after having been extradited from the Federated States of Micronesia.

Meanwhile, on June 29, 2016, CW filed a civil lawsuit in federal court (the **Federal Lawsuit**) against DPS, Siugpiyemal, and others. On September 13, 2016, DPS filed its answer in the Federal Lawsuit. DPS admitted that Siugpiyemal was employed as an Adult Corrections Officer assigned to MCCC on the dates upon which the sexual assaults allegedly took place but asserted, as an affirmative defense, that the alleged assaults were outside of the course and scope of Siugpiyemal's employment by DPS.

Siugpiyemal's criminal jury trial began on July 10, 2017. CW testified that after Siugpiyemal learned she had a Facebook account, "He let me know that I could get into trouble for being on Facebook and that there's no social networking and that he just kept advising me that that wasn't what I was supposed to do is be on Facebook. And then he just started having small talk with me and asked me to send him naked photos of myself." CW testified: "I was worried that [Siugpiyemal] was going to turn me in for social networking and that I would lose my furlough." She testified she had sexual contact with

Siugpiyemal on July 31, 2014 and August 11, 2014, at the Maui Tropical Plantation. On July 11, 2017, the jury was shown a video recording of Siugpiyemal and CW engaged in sex acts on August 11, 2014.

On July 12, 2017, the State rested its case and Siugpiyemal moved for judgment of acquittal. Both of his sexual contacts with CW took place at the Maui Tropical Plantation, and he argued that he was "not on the job working in the Maui Community Correctional Center when he engaged in sex acts with [CW]." The Circuit Court denied the motion.

The jury returned its verdict on July 14, 2017. The jury found Siugpiyemal not guilty on Count One and Count Two, but guilty on Counts Three, Four and Five. Siugpiyemal moved for a new trial on Counts 3-5. The Circuit Court conducted an evidentiary hearing and entered findings of fact, conclusions of law and an order denying the motion. The Judgment was entered on November 14, 2017. This appeal followed.

## II.

### A.    **Motion for Judgment of Acquittal**

Siugpiyemal first argues that the Circuit Court erred in denying his motion for judgment of acquittal. The motion was based upon the wording of Hawaii Revised Statutes (**HRS**) §§ 707-731(1)(c)(i) and 707-732(1)(e)(i) (2014), both of which require that the defendant be "employed in a state correctional facility[.]" Siugpiyemal contended that the plain language of the statutes encompassed only sexual assaults that took place "in" the correctional facility where the defendant was employed. He argued that because his sexual contacts with CW took place at the Maui Tropical Plantation when he was off duty and when CW was away from MCCC on work furlough, there was no evidence that he violated either statute.

3

The Circuit Court disagreed, stating:

> [I]f the Court looks at the -- at the statute in question and at the charge here, the conduct that is alleged is that of subjecting a person to sexual penetration. The employment status of the individual is an attendant circumstance.[2]
>
> . . . .
>
> And there is no requirement that the person -- the actor be on duty at the time but, rather, be a person who is employed in a state correctional facility at the time that he subjects a person -- an inmate to an act of sexual penetration in Counts One through Three and an act of sexual contact in Counts Four and Five.
>
> So I'm satisfied from the language of the statute and the charges here that the government has established sufficient evidence to establish each -- each of the elements of the offense charged with respect to both conduct and attendant circumstances, both as to the defendant as well as the status of the complaining witness at the time of the alleged offenses.

(footnote added).

We agree with the Circuit Court. Statutory construction is guided by the following rules:

> First, the fundamental starting point for statutory interpretation is the language of the statute itself. Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning. Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists. And fifth, in construing an ambiguous statute, the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning.

---

[2] HRS § 702-205 (2014) provides:

The elements of an offense are such (1) conduct, (2) attendant circumstances, and (3) results of conduct, as:

    (a)    Are specified by the definition of the offense, and

    (b)    Negative a defense (other than a defense based on the statute of limitations, lack of venue, or lack of jurisdiction).

State v. Woodfall, 120 Hawai'i 387, 391, 206 P.3d 841, 845 (2009)
(citations omitted).  In addition:

> The legislative history of a statute remains relevant even
> when the language appears clear upon perfunctory review.
> Were this not the case, a court may be unable to adequately
> discern the underlying policy which the legislature seeks to
> promulgate and, thus, would be unable to determine if a
> literal construction would produce an absurd or unjust
> result, inconsistent with the policies of the statute.

Wells Fargo Bank, N.A. v. Omiya, 142 Hawai'i 439, 452, 420 P.3d
370, 383 (2018) (citations and quotation marks omitted).

The criminal statutes at issue are HRS §§ 707-731 and
707-732.  At the time relevant to this appeal, those statutes
provided, in relevant part:

> **§ 707-731 Sexual assault in the second degree.**  (1) A
> person commits the offense of sexual assault in the second
> degree if:
>
> . . . .
>
> (c)   The person, while employed:
>
>> (i)    In a state correctional facility;
>>
>> (ii)   By a private company providing services at
>>        a correctional facility;
>>
>> (iii)  By a private company providing
>>        community-based residential services to
>>        persons committed to the director of
>>        public safety and having received notice
>>        of this statute;
>>
>> (iv)   By a private correctional facility
>>        operating in the State of Hawaii; or
>>
>> (v)    As a law enforcement officer as defined in
>>        section [710-1000],
>>
>> knowingly subjects to sexual penetration an
>> imprisoned person, a person confined to a
>> detention facility, a person committed to the
>> director of public safety, a person residing in
>> a private correctional facility operating in the
>> State of Hawaii, or a person in custody;
>> provided that . . . this paragraph shall not be
>> construed to prohibit practitioners licensed
>> under chapter 453 [medicine and surgery] or 455
>> [naturopathic medicine] from performing any act
>> within their respective practices; and further
>> provided that this paragraph shall not be

construed to prohibit a law enforcement officer from performing a lawful search pursuant to a warrant or exception to the warrant clause[.]

> **§ 707-732 Sexual assault in the third degree.** (1) A person commits the offense of sexual assault in the third degree if:
>
> . . . .
>
> > (e)   The person, while employed:
> >
> > > (i)   In a state correctional facility;
> > >
> > > (ii)   By a private company providing services at a correctional facility;
> > >
> > > (iii) By a private company providing community-based residential services to persons committed to the director of public safety and having received notice of this statute;
> > >
> > > (iv)   By a private correctional facility operating in the State of Hawaii; or
> > >
> > > (v)   As a law enforcement officer as defined in section [710-1000],
> >
> > knowingly subjects to sexual contact an imprisoned person, a person confined to a detention facility, a person committed to the director of public safety, a person residing in a private correctional facility operating in the State of Hawaii, or a person in custody, or causes the person to have sexual contact with the actor[.]

HRS §§ 707-731 and 707-732 took effect on January 1, 1987.   1986 Haw. Sess. Laws Act 314, § 57 at 617-18, § 80 at 629. Those statutes originally provided, in relevant part:

> **§ 707-731 Sexual assault in the second degree.** (1) A person commits the offense of sexual assault in the second degree if:
>
> . . . .
>
> > (c)   The person, while employed in a state correctional facility, knowingly subjects to sexual penetration an imprisoned person.

> **§ 707-732 Sexual assault in the third degree.** (1) A person commits the offense of sexual assault in the third degree if:
>
> . . . .

6

(d)     The person, while employed in a state
        correctional facility, knowingly subjects to
        sexual contact an imprisoned person or causes
        such person to have sexual contact with the
        actor.

The statutes were amended in 1987 to clarify that they do not
prohibit "practitioners licensed under chapter 453 [medicine and
surgery], 455 [naturopathic medicine], or 460 [osteopathy],[3]
from performing any act within their respective practices."  1987
Haw. Sess. Laws Act 181, §§ 10 and 11 at 411 (footnote added).

Section 707-731 was amended in 1997 to provide, in
relevant part:

> **§ 707-731 Sexual assault in the second degree.**  (1) A
> person commits the offense of sexual assault in the second
> degree if:
>
> . . . .
>
> (c)     The person, while employed in a state
>         correctional facility[,] or while employed as a
>         law enforcement officer as defined in section
>         710-1000(13), knowingly subjects to sexual
>         penetration an imprisoned person[;], a person
>         confined to a detention facility, or a person in
>         custody[.]

1997 Haw. Sess. Laws Act 366, § 1 at 1149 (material repealed is
bracketed, new language is underscored).  Of the amendments, the
Senate Judiciary Committee reported:

> The purpose of this bill is to extend the existing
> prohibition of sexual penetration of a prisoner by a
> corrections officer to a general prohibition of sexual
> penetration of any arrested or detained person by a public
> official who is detaining them.
>
> . . . .
>
> Your Committee finds that under current law, adult
> corrections officers are held to a higher standard of
> conduct in relation to their prisoners than police officers.
> If an imprisoned person is subjected to an act of consensual
> or nonconsensual sexual penetration by a corrections
> officer, the act constitutes sexual assault in the second
> degree.  However, if an imprisoned person is subjected to an
> act of sexual penetration by a police officer, the

---

³       The exceptions for osteopathy were repealed by 2009 Haw. Sess.
Laws Act 11, §§ 73 and 74 at 35-36.

> prosecution must prove beyond a reasonable doubt that the
> person did not consent to the penetration.
>
> Your Committee further finds that existing law
> recognizes that a person in custody is in no position to
> consent to an act of sexual penetration by those who are
> incarcerating them. Thus, your Committee believes that the
> policy of preventing coercion by correctional officers for
> sexual favors from inmates and to prevent inmates from using
> sex to extort favors from correctional officers should be
> extended to all law enforcement officers.

S. Stand. Comm. Rep. No. 767, in 1997 Senate Journal, at 1195

(emphasis added). No parallel change was made to § 707-732 but,

in 2001, the legislature amended § 707-732 to read, in relevant

part:

> **§ 707-732 Sexual assault in the third degree.** (1) A
> person commits the offense of sexual assault in the third
> degree if:
>
> . . . .
>
> [+d+] (e)  The person, while employed in a state
>            correctional facility, knowingly subjects
>            to sexual contact an imprisoned person or
>            causes [such] the person to have sexual
>            contact with the actor[.]

2001 Haw. Sess. Laws, 2nd Spec. Sess. Act 1, § 2 at 941-42

(material repealed is bracketed and stricken, new language is

underscored).

The 2002 Legislature significantly broadened the scope

of both statutes to include, in addition to persons employed in

state correctional facilities and law enforcement officers,

private companies providing services at a correctional facility

or community-based residential services to persons committed to

the director of public safety, and private correctional

facilities operating in the State of Hawai'i. 2002 Haw. Sess.

Laws Act 36, §§ 1 and 2 at 106-08. The House Committee on Public

Safety and Military Affairs reported:

> Your Committee finds that given the inherent power
> imbalance between imprisoned persons and staff at
> correctional facilities, there can be no truly consensual
> sexual contact between such parties. This measure closes a
> loophole in existing statutes and thereby provides needed
> protection to persons under the custody of the state.

8

H. Stand. Comm. Rep. No. 88, in 2002 House Journal, at 1268.  The House Committee on Judiciary and Hawaiian Affairs reported:

> The purpose of the bill is to prohibit private company employees at correctional facilities or in other residential services under the Director of Public Safety from knowingly subjecting imprisoned persons to sexual contact or sexual penetration.
>
> . . . .
>
> Your Committee finds that inmates are particularly vulnerable to sexual assaults from employees at correctional facilities.  Private employees associated with the prison system are in the same position of authority as state employees over the inmates they supervise.
>
> Your Committee has amended this bill by declaring that criminal liability applies to employees of a private company providing community-based residential services to persons committed to the Director of Public Safety only if such employees have received notice of the prohibition against sexual relations with inmates.  Your Committee has authorized this amendment under the assumption that the Department of Public Safety intends to require potential private companies to agree to educate their employees on the prohibition against sexual relations with inmates.

H. Stand. Comm. Rep. No. 696, in 2002 House Journal, at 1493.

The 2004 Legislature expanded the class of persons protected by § 707-731 to persons "committed to the director of public safety," adding language that had already been added to § 707-732 in 2002.  2004 Haw. Sess. Laws Act 61, § 4 at 303.  The purpose of the amendment was "to . . . [i]nclude as a victim of sexual assault in the second degree, a person committed to the director of public safety and knowingly subjected to sexual penetration[.]"  Conf. Comm. Rep. No. 35-04 on H.B. No. 2254, in 2004 Senate Journal, at 1016-1017.  A person "committed to the director of public safety" need not necessarily be confined to a state correctional facility.  See Turner v. Hawaii Paroling Auth., 93 Hawai'i 298, 1 P.3d 768 (App. 2000).  It follows that the legislature intended to prohibit a person who was employed in a state correctional facility from sexually penetrating a person committed to the director of public safety no matter where the prohibited contact takes place.  The interpretation proposed by Siugpiyemal is absurd and contrary to the legislative history.

Siugpiyemal cites <u>State v. Hicks</u>, 113 Hawai'i 60, 148 P.3d 493 (2006) (assault in Hawai'i Youth Correctional Facility) and <u>State v. Cardus</u>, 86 Hawai'i 426, 949 P.2d 1047 (App. 1997) (encounter in O'ahu Community Correctional Center). Neither case stands for the proposition that the location where the prohibited conduct took place is an attendant circumstance. The issues in <u>Hicks</u> were whether the Hawai'i Youth Correctional Facility is a "state correctional facility" (yes, it is) and whether the complaining witness (a "ward") was an "imprisoned person" (yes, he was) within the meaning of HRS § 707-732. The issue in <u>Cardus</u> was whether the consent of the imprisoned person is a defense to a violation of HRS § 707-731 (no, it is not). The legislative history of HRS §§ 707-731 and 707-732 confirms that the legislature intended for the actor being employed in a state correctional facility (among other things) and the victim being a person committed to the director of public safety (among other things) to be attendant circumstances to the prohibited conduct (sexual penetration or contact). Nothing in the legislative history suggests an intent to place geographic limitations on the prohibition. The legislature intended that the statutes apply to precisely the conduct engaged in by Siugpiyemal in this case. The Circuit Court correctly denied Siugpiyemal's motion for judgment of acquittal.

## B.     **Evidence from the Federal Action**

Siugpiyemal contends that the Circuit Court erroneously refused to admit into evidence a redacted copy of the answer filed by DPS in CW's Federal Lawsuit. DPS's answer asserted that the sexual assaults allegedly committed by Siugpiyemal were outside the course and scope of his employment by DPS. Siugpiyemal argues that DPS's federal assertion constituted an admission by the State, and that the State is judicially estopped from prosecuting him because "if [he] was not acting within the course and scope of his employment as [DPS] pled he could not have been said to have committed this offense."

We need not decide whether DPS's answer to the Federal Lawsuit contains an admission as argued by Siugpiyemal. Even if DPS's answer could be characterized as an admission, the course and scope of employment issue is irrelevant to Siugpiyemal's criminal case because course and scope of employment is not an attendant circumstance of HRS §§ 707-731 or 707-732. It is the status of being "employed in a state correctional facility" that is the relevant attendant circumstance. Irrelevant evidence is not admissible. Hawaii Rules of Evidence (**HRE**) Rule 402.

Nor could the answer filed by DPS in the Federal Lawsuit be a basis for judicial estoppel. Judicial estoppel is a form of equitable estoppel by which a party is precluded from subsequently repudiating a theory accepted and acted upon by the court. Rosa v. CWJ Contractors, Ltd., 4 Haw. App. 210, 220, 664 P.2d 745, 752 (1983). Nothing in the record indicates that the Circuit Court either accepted or acted upon any assertion made in DPS's answer to the Federal Lawsuit. The Circuit Court did not err in refusing to admit DPS's answer to the Federal Lawsuit into evidence.

## C. Jury Instructions

Siugpiyemal's third point of error simply states "Did the court properly instruct the jury?" and refers to the appendix to his opening brief. The appendix for the third point of error contains copies of jury instructions 18, 19, 20, 21, 22, 29, and 30. It appears from the record on appeal that instructions 18, 19, 20, 21, 22 and 30 (the **Agreed-Upon Instructions**) were given by agreement. However, "the lack of a timely objection is of no consequence in determining whether instructional error is harmful[.]" State v. Nichols, 111 Hawai'i 327, 337 n.6, 141 P.3d 974, 984 n.6 (2006) (citation and internal quotation marks omitted).

> Where instructions were not objected to at trial, if the appellant overcomes the presumption that the instructions were correctly stated, the rule is that such erroneous

11

> instructions are presumptively harmful and are a ground for
> reversal unless it affirmatively appears from the record as
> a whole that the error was not prejudicial.

Id. at 334-35, 141 P.3d at 981-82 (emphasis added) (quoting State v. Eberly, 107 Hawai'i 239, 250, 112 P.3d 725, 736 (2005)).

Siugpiyemal's opening brief does not discuss specific language in the Agreed-Upon Instructions nor does it cite any case law with which the Agreed-Upon Instructions conflict.[4] Rather, Siugpiyemal argues that the Agreed-Upon Instructions "took away the vital role of the jury to determine the facts put before them" because he "was acting outside the course and scope of his employment, he was not 'in' [MCCC] when the acts occurred [and t]here was never any interaction within the facility[.]" For the reasons set forth in sections II.A. and B. of this opinion, the course and scope of employment is not an attendant circumstance of HRS §§ 707-731 or 707-732. Nor is the location where the prohibited conduct took place an attendant circumstance of HRS §§ 707-731 or 707-732. Siugpiyemal has not overcome the presumption that the Agreed-Upon Instructions were correctly stated.

Instruction 29, which was the court's instruction number 4 as modified, was objected to by Siugpiyemal when the parties were settling jury instructions. The instruction stated:

> The prosecution must prove each of the material
> elements of each of the charges in this case beyond a
> reasonable doubt. However, 1) that the offenses were
> committed in a correctional facility, or 2) that the
> offenses were committed while the Defendant was on duty as a
> correctional officer, are not material elements of any of
> the offenses charged in this case.

For the reasons set forth in sections II.A. and B. of this opinion, the instruction was a correct statement of the law and the Circuit Court did not err in giving it to the jury.

---

[4] Siugpiyemal waived his right to submit a reply brief.

D.    **Motion for New Trial**

Siugpiyemal's final point of error challenges the Circuit Court's denial of his motion for new trial.[5]  "The granting or denial of a motion for new trial is within the sound discretion of the trial court and will not be disturbed absent a clear abuse of discretion.  It is well-established that an abuse of discretion occurs if the trial court has clearly exceeded the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant."
State v. Austin, 143 Hawai'i 18, 29, 422 P.3d 18, 29 (2018) (internal quotation marks, citations and brackets omitted).

Siugpiyemal contends that the State failed to disclose Brady material[6] which would have enabled him to challenge CW's credibility.  The information at issue concerned two criminal cases in which CW had been charged with several counts of theft and burglary.  CW pleaded no contest in each case pursuant to plea agreements.  On June 14, 2017 – one month before Siugpiyemal's trial began on July 10, 2017 – the court found CW guilty and sentenced her to one year in jail in each case.

The Circuit Court conducted an all-day evidentiary hearing on Siugpiyemal's motion for new trial.  The transcript totals 165 pages.  The Circuit Court entered findings of fact, conclusions of law and an order denying the motion.  The Circuit Court made the following findings of fact:

> 17.    No plea agreements remained pending between [CW] and the prosecution in [the two criminal cases at issue] after June 14, 2017.
>
> 18.    On July 10, 2017, [Siugpiyemal], as well as trial counsel, stipulated to the admissibility of

---

[5]    The Honorable Peter T. Cahill presided over the motion after the Honorable Joseph E. Cardoza recused himself.

[6]    In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Id. at 87.

complaining witness' August 11, 2014, video of sexual acts between [Siugpiyemal] and the complaining witness.

19.   On July 11, 2017, the Court admitted State's Exhibit S-12, the video and played it before the jury.

.  .  .  .

22.   The Court finds that based upon the admissible evidence submitted, including the testimony of Maui County Prosecutors Mark Simonds and Carson Tani, and Drug Court Administrator's [sic] Dean Ishihara, undisclosed documents . . . (collectively, the "Maui Drug Court Program Correspondence") not exculpatory and not material pertaining to the guilt or punishment of [Siugpiyemal].

23.   The Maui Drug Court Program correspondence did not tend to negate the guilt of the Defendant Siugpiyemal as to the offenses charged and did not tend to reduce his punishment for Sexual Assault in the Second Degree and Sexual Assault in the Third Degree.

.  .  .  .

26.   Between November 4, 2016 and July 14, 2017 [the date Siugpiyemal's criminal trial ended], [CW] continued to serve her indeterminate ten (10) year prison term in State of Hawai'i v. [CW].  The Hawai'i Paroling Authority revoked [CW]'s parole status . . . on February 29, 2016, and she remained revoked throughout the hearing [on Siugpiyemal's motion for new trial] on August 24, 2017.

27.   The Court finds credible the evidence that [CW] could not be admitted into the Maui Drug Court Program without the agreement of the Department of Public Safety as a Track V case or the Hawai'i Paroling Authority in a Track IV case.

28.   [CW] could not actively participate in the Maui Drug Court Program because of her housing status at the Federal Detention Center.

29.   [CW] has never been afforded admission into the Maui Drug Court Program under [her theft and burglary cases].

30.   Deputy Prosecuting Attorney ("DPA") Mark Simonds never offered [CW] admission into the Maui Drug Court Program in exchange for her testimony in [Siugpiyemal's criminal case].

31.   DPA Mark Simonds never promised or entered into any agreements with [CW] in relation to her [theft and burglary cases].

32.   The Court finds, however, that based upon the credible evidence and testimony that the prosecution had a duty to disclose and breached that duty as it pertains to the conviction in [CW's theft and burglary cases].

33.   The convictions [of CW] for Theft in the Third Degree tended to negate the evidence offered by the

14

prosecution at [Siugpiyemal's] trial that [CW] told the truth and may have reflected on her credibility.

. . . .[7]

34.     In [CW's theft and burglary cases], DPA Tani did not offer [CW] misdemeanors in exchange for her testimony in [Siugpiyemal's case].  Nor did DPA Tani make any other promises other than those reflected in the plea deal.

35.     Based upon the credible evidence, the Defendant failed to show that he has been prejudiced by the prosecution's breach of its duty to disclose the convictions of complaining witness in [the theft and burglary cases] filed on June 14, 2017.

. . . .

37.     Evidence or testimony that [CW] entered into plea agreements with the prosecution for misdemeanors in [her theft and burglary cases] would not have created a reasonable doubt when considered in light of other evidence including the August 11, 2014, video recording of the sexual acts that did not otherwise exist at the time of the trial in [Siugpiyemal's case].

38.     The Court finds that no reasonable probability exists that had the misdemeanor convictions in [CW's theft and burglary cases] been disclosed to the Defendant, the result of the trial would have been different.

39.     Introduction of impeachment evidence relative to [CW's] Theft in the Third Degree convictions in [her theft and burglary cases] would not have created a probability sufficient to undermine confidence in the outcome of the trial on July 14, 2017 based upon all other evidence considered by the jury as set forth in this record as well as the agreed upon representation of the State and defense.

40.     The nature of any plea agreement evidence involving [CW] in [her theft and burglary cases] would not have changed the result of a later trial.

41.     The defense has failed to show how evidence of the plea agreements or convictions in [CW's theft and burglary cases] are material to the issue of James Siugpiyemal's guilt or punishment.

The Circuit Court concluded that the State had a duty to disclose CW's theft and burglary cases, and the plea bargain, conviction and sentencing, to Siugpiyemal.  The Circuit Court then made the following conclusion of law:

11.     The Court further concludes as a matter of law that the breach of duty does not, however, create a reasonable probability sufficient to undermine the

_____

[7]     There are two paragraph nos. 34 in the FOF&COL.

confidence of the outcome. Because the jury heard of
the complaining witness' other convictions including
her current incarceration for ten years and other
evidence such as video recording.

"[D]ue process requires that the prosecution disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." Birano v. State, 143 Hawaiʻi 163, 181, 426 P.3d 387, 405 (2018) (citation and internal quotation marks omitted). "The duty to disclose evidence that is favorable to the accused includes evidence that may be used to impeach the government's witnesses by showing bias, self-interest, or other factors that might undermine the reliability of the witness's testimony." Id. at 182, 426 P.3d at 406 (citing Giglio v. United States, 405 U.S. 150, 154 (1972)). However, "[v]iolation of the constitutional right to confront adverse witnesses is subject to the harmless beyond a reasonable doubt standard." Id. at 190, 426 P.3d at 414 (citations omitted). The State's failure to disclose impeachment evidence warrants a new trial only if the evidence is "material." Id. "[E]vidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. at 191, 426 P.3d at 415 (citations and quotation marks omitted).

We conclude that the Circuit Court did not abuse its discretion when it denied Siugpiyemal's motion for new trial. The court's findings of fact were supported by substantial evidence including the trial testimony of CW herself. On direct examination by the State, CW testified:

Q.    Where are you currently housed?

A.    The Federal Detention Center.

Q.    And before that, where were you housed?

A.    At the Maui Community Correctional Center.

. . . .

Q.    How long have you been in, I guess, Maui
Community Correctional Center?

A.    I've been incarcerated now for 20 months.

Q.    Before that, though, had you been incarcerated previously?

A.    Yes.

Q.    And when is maybe the earliest you can remember after your 18th birthday?

A.    I was incarcerated most of my adult life.

. . . .

Q.    Do you remember -- well, you know, you mentioned you'd been, I guess, in the system for a while. And have you lied before?

A.    Yes.

Q.    Have you stolen?

A.    Yes.

Q.    Have you smuggled drugs?

A.    Yes.

Q.    On August 11th, 2014 and July 31st, 2014, what was your status with the Director of the Department of Public Safety?

A.    I was an inmate.

Q.    And at that time, in 2014, what were you incarcerated for?

A.    Burglary, theft.

Q.    And what was your sentence?

A.    Ten years.

On cross-examination by Siugpiyemal's defense counsel, CW testified:

Q.    In 2014, you were in custody.  Correct?

A.    Yes.

Q.    You were sentenced to prison?

A.    Yes, sir.

Q.    And you were in custody because -- you got a ten-year sentence, I believe?

A.    Yes.

Q.    Ten years and a mandatory minimum of three years, four months?

A.    Yes, sir.

Q.    You were found guilty of burglary?

A.    Yes, sir.

Q.    Theft in the First Degree?

A.    Yes, sir.

Q.    Theft in the Third?

A.    Yes, sir.

Q.    And unauthorized use of confidential and personal information, like credit card info?

A.    Yes, sir.

Q.    And that's related to something that happened back in 2010.  Correct?

A.    Yes, sir.

Q.    You went into someone else's house?

A.    Yes, sir.

Q.    And you were uninvited?

A.    Yes, sir.

Q.    And you stole electronics and jewelry?

A.    Yes, sir.

Q.    You got caught when you went down to the pond [sic] shop to try to exchange it for money.  Right?

A.    Yes, sir.

Q.    And you never got the money?

A.    No, sir.

Q.    And that wasn't the only time you tried to get money that you didn't earn.  Is that correct?

A.    Yes, sir.

. . . .

Q.    Do you remember getting questioned by the police about forged checks back in 2007?

A.    Yes.

Q.    And that was involving something that happened down at the Queen Kaahumanu shopping center.  Right?

A.    Yes, sir.

Q. And it was like one of those Payday exchange places?

A. Yes, I remember what you're talking about.

Q. Okay, great. All right.

And so you were involved with this other person, and her name was Adriann Paleka-Wright?

A. Yes, sir.

. . . .

Q. All right. She had a photo ID, didn't she?

A. Yes, sir.

Q. And that's what you need to cash these checks?

A. Yes, sir.

Q. And you didn't?

A. I didn't have, no, sir.

Q. And you wrote out five checks, and you asked her to cash it?

A. Yes, sir.

Q. Police questioned you about it?

A. Yes, sir.

Q. You never got the cash from those checks. Right?

A. No, sir.

Q. And then we get to this incident in 2011, you're sentenced to prison. And then around 2014, you're sent back here to the jail on Maui for the work furlough program. Right?

A. Yes, sir.

Q. And, you know, before you got started on the furlough program, you had conditions of furlough. Correct?

A. Yes.

Q. And you had to go over that with a counselor?

A. Yes, sir.

Q. You signed off on it?

A. Yes, sir.

. . . .

Q.      Now, one of the conditions you're saying is no Facebook?

A.      No social media.

Q.      That's something in writing?

A.      Yes, sir.

Q.      And that's something you signed off on?

A.      Yes, sir.

Q.      So that's part of your work furlough contract, you can't go on social media?

A.      Yes, sir.

.   .   .   .

Q.      And, again, do you remember being interviewed by Detective Oran Satterfield about all this again?

A.      Yes.

.   .   .   .

Q.      In any event, he asked you if you had posted something on Facebook, and you lied to him?

A.      Yes.

Q.      You lied because you, in fact, did put a picture of yourself on Facebook?

A.      Yes.

.   .   .   .

Q.      When you were sentenced to prison, did you feel that the public needed to be protected from you?

A.      I feel like I deserved to do prison time.

Q.      Do you feel that you were a danger to the public?

A.      I felt that I needed a time-out because I was using drugs and I was a danger to the public.

Q.      You needed a time-out for ten years?

A.      I wouldn't want ten years.

Q.      Right. You said you needed a time-out because you were using drugs.  Right?

A.      Yes.

Q.      And because you were using drugs, you would steal.  Right?

A.      Yes, sir.

Q.    And you were hurting people because you we're [sic] using drugs?

A.    Yes, sir.

Q.    So it wasn't just the drugs, it was all the other stuff that you would do because of the drugs.  Right?

A.    Yes, sir.

.  .  .  .

Q.    You've smuggled drugs into prison, haven't you?

A.    Yes, sir, I have.

Q.    And you've been high in prison, haven't you?

A.    Yes.

Q.    So this time was going to be different?

A.    What time?

Q.    The time you went to prison when you said you needed the time-out?

A.    I was clean for that -- my whole prison term.

Q.    Then you get the furlough.  Right?

A.    Yes, sir.

.  .  .  .

Q.    But at some point after the furlough, you re-used.  Correct?

A.    Yes, sir.

Q.    Right.  So you had a stint of sobriety, but that ended when you relapsed?

A.    When I paroled out.  After I paroled out.

Q.    I see.  So you had the furlough and then you paroled out and that's when you relapsed and that's why you're in custody now?

A.    Yes.

Q.    So you haven't been clean this whole time. Correct?

A.    After I got out after the four years and everything that happened with these incidences and everything that was going on -- I'm an addict.  I didn't know.  I turned to using drugs again.

Q.    Right.  You turned to using drugs again.  And because you turned to using drugs again, you started to manipulate others for your drugs.  Correct?

21

A.      Yes, sir.

. . . .

Q.      And, [CW], you would agree that when you were using drugs, that is an addiction.  Correct?

A.      Yes.

Q.      And that when you are addicted to drugs, you will manipulate and use others to get what you want?

A.      Yes.

Q.      And because of that, you've lied?

A.      Yes.

Q.      And because of that, you have tried to persuade others to get what you want.  Right?

A.      Yes, sir.

. . . .

Q.      And you know how to manipulate?

A.      Yes.

Q.      How long have you been using drugs?

A.      Since I was 12.

Q.      So you have been learning to lie and manipulate since then?

A.      I've done a lot of things that I'm not proud of. I've made a lot of poor choices.

Q.      I'm sorry about that.

And my question is as long as you've been using drugs, you've been learning these other things too, haven't you? It leads to those things, doesn't it?

A.      Yes.

Q.      So you have been lying and manipulating since you were 12?

I know it's not easy.  But is that true?

A.      Yes.

Siugpiyemal's defense counsel conducted extensive cross-examination to challenge CW's credibility.  The jury convicted Siugpiyemal on the counts that were substantiated by the August 11, 2014 videotape, and found him not guilty on the counts that were not.  The Circuit Court correctly applied the

22

applicable law to the facts.  The Circuit Court's conclusion that it was not reasonably probable that, had the <u>Brady</u> material at issue been disclosed to the defense, the result of Siugpiyemal's trial would have been different, was not an abuse of discretion. It was not error for the Circuit Court to deny Siugpiyemal's motion for new trial.

### III.

For the foregoing reasons, the Judgment Conviction and Sentence entered by the Circuit Court of the Second Circuit on November 14, 2017, is affirmed.

DATED:  Honolulu, Hawai'i, February 15, 2019.

On the briefs:

Richard D. Gronna,
for Defendant-Appellant.

Peter A. Hanano,
Deputy Prosecuting Attorney,
County of Maui
for Plaintiff-Appellee.

Presiding Judge

Associate Judge

Associate Judge